CHARLES AXELROD, ESQ.
*[Pro Hac Vice Pending]*
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
      caxelrod@foxrothschild.com
      mmoore@foxrothschild.com
*Counsel for Ernst & Young, Inc. as Foreign*
*Representative of Veris Gold Corp. et al.*

Electronically Filed June 9, 2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. 14- |
| | (Joint Administration Requested) |
| VERIS GOLD CORP.,[1] | Chapter 15 |
| Debtors in a Foreign Proceeding. | **DECLARATION OF SHAUN HEINRICHS IN SUPPORT OF VERIFIED PETITION FOR RECOGNITION AND CHAPTER 15 RELIEF** |

    I, Shaun Heinrichs, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

    1.    I am over the age of 18 and, unless otherwise indicated, all facts set forth in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; or (c) my opinion based upon my experience and knowledge of the operations of each of the above-captioned

---

[1]    The Debtors, along with the last four digits of each U.S. Debtors' federal tax identification number, if any, are: Veris Gold Corp. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number), Queenstake Resources Ltd. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number), Ketza River Holdings Ltd. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number), and Veris Gold U.S.A., Inc. (6862). The location of the Debtors' corporate headquarters and the service address for all of the Debtors is: 900-688 West Hastings Street, Vancouver BC V6B 1P1, Canada, Attn: Shaun Heinrichs.

ACTIVE 25934136v1 00/00/0000

debtors (the "Debtors" or the "Veris Gold Group"). If called to testify, I could testify competently to the facts set forth herein.

2.    I am the Chief Financial Officer of Veris Gold Corp. ("VGC") and the other Debtors. I have been the Chief Financial Officer of the Debtors since 2008.  As Chief Executive Officer, I have extensive knowledge of the structure, operations, and finances of VGC, and each of its global subsidiaries (collectively, "Veris").

3.    Ernst & Young, Inc. ("E&Y," the "Foreign Representative") is duly authorized to act as foreign representative of the Debtors, whose reorganization proceedings (the "Canadian Proceeding") under Canada's *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended (the "CCAA") currently are pending before the Supreme Court of British Columbia, Canada, Judicial District of Vancouver (the "Canadian Court").

4.    I submit this Declaration in support of the *Petition for Recognition and Chapter 15 Relief* (the "Petition") as well as the *Motion for Entry of an Order Granting Provisional Relief Under Section 1519 of the Bankruptcy Code*, and I am authorized to submit this declaration on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, my review of relevant documents or information supplied to me by other members of the Debtors' management or the Debtors' professionals. If I were called upon to testify, I could and would testify competently to the fact set forth herein.

## I.    General Background of the Debtors

5.    The Debtors are a consolidated business enterprise comprising various exploration, mining, production, sales, and distribution operations in Canada and the United States.  Due to several factors including the Debtors' existing capital structure, the bid environment in the mining and metals industry, VGC's depressed share price and the current commodity pricing environment, the Debtors need to restructure their business to emerge as a viable and successful entity going forward.

6.    To preserve value while determining and effectuating its strategic options, on June 9, 2014, Debtor VGC, and its Canadian-based and United States-based subsidiaries, commenced the Canadian Proceeding.  On June 9, 2014, the Canadian Court issued an initial order staying certain

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

creditor actions, appointing E&Y as the monitor of the Debtors in the Canadian Proceeding and authorizing the Foreign Representative to apply for relief in this Court pursuant to chapter 15 of the Bankruptcy Code.

7.     VGC, a company incorporated in British Columbia, Vancouver, is a public company which shares are traded on the Toronto Stock Exchange and the Frankfurt Exeter Exchange. VGC is the direct parent of Queenstake Resources Ltd., a company incorporated in British Columbia, Vancouver ("Queenstake") and Ketza River Holdings Ltd., a company incorporated in the Yukon Territory ("Ketza").  Veris Gold USA, Inc. (formerly known as Queenstake Resources USA, Inc.), a company incorporated under the laws of the State of Delaware, is a wholly owned subsidiary of Queenstake ("Veris USA").

8.     VGC carries its business and maintains an office in the City of Vancouver, British Columbia.  Head office functions for all members of the Veris Gold Group are provided from VGC's offices in Vancouver, where corporate operations are directed and controlled.  The Debtors' banking, corporate accounting, corporate finance, shareholder relations, international relations, taxation, audit and business strategy functions are directed by and carried out by VGC in Vancouver, British Columbia.

9.     Limited management functions, including payroll, plant and mine management for Veris USA are provided in Nevada, largely done at site with support from a small office located in Elko, Nevada.  Veris USA owns and operates a gold mine which is currently in production (the "Gold Mine"). It also owns patented and unpatented land claims, a plant of approximately 35,000 square feet, equipment, real estate and other assets in the State of Nevada.  The Gold Mine is located at Jerritt Canyon, in Elko County, Nevada.  The Jerritt Canyon property includes several underground gold mines.

10.     Ketza is incorporated and carries on its business in the Yukon Territory in Canada, as a gold and silver exploration company. It owns land claims and the mining property is primarily in the development and preproduction phase.

11.     In 2013, VGC commenced gold production at the Starvation Canyon mine, the third underground gold mine located at the south end of Jerritt Canyon and announced the development of a

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

fourth underground mine, with production expected to start in 2014. Also, in 2013, VGC entered into a toll milling agreement with Newmont USA Ltd. As a result of the toll milling opportunities, the Veris Gold Group mill has excess capacity.

12.     VGC employs 9 salaried employees and one executive in Canada. The senior management of the Debtors is located in Vancouver, Canada. In addition, Veris USA employs approximately 280 employees in Nevada

13.     For 2013, the Veris Gold Group's gross payroll obligations – including payroll liabilities, current portion of pension and other post-employment benefits have averaged approximately USD $7,000,000 per quarter. As of the most recent payroll, all of the Veris Gold Group's payroll obligations were paid except for approximately USD $1,760,000 in federal tax payable in the US (approximately 6 pay periods).

## II.      The Debtors' Capital Structure

*Deutsche Bank Gold Purchase Agreements*

14.     Veris USA entered into two Forward Gold Purchase Agreements with Deutsche Bank AG, London Branch ("Deutsche Bank"), which are guaranteed by VGC, Queenstake and Ketza. Under the Purchase Agreements, Deutsche Bank advances funds to the Debtors and, in exchange, has the right to purchase gold from the Debtors over time in the future at a discount. The amount of gold, the time frames for purchase and the discount to be applied were set out in the applicable agreement. Effectively, the funds Deutsche Bank paid were a partial advance for gold to be supplied in the future. The terms of the Purchase Agreements operated to give Deutsche Bank a fixed return, except where the price was outside of specified minimum and maximum prices.

15.     Under the minimum pricing, if the market price of gold was the minimum price ($850 per ounce) or less, the Deutsche Bank purchase price would be $0, and Veris Gold Group would not be required to rebate Deutsche Bank the difference between the market price of gold and the minimum price under the contract. Under the maximum pricing, the contract specified a cap amount. If the market price of gold exceeded the maximum price, Deutsche Bank would not be required to pay any amount above the maximum price to the Veris Gold Group. The minimum and maximum prices in

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

each of the Purchase Agreements were outside the range of prices at which gold had traded for several years prior.

16.    The first Forward Gold Purchase Agreement dated as of August 12, 2011 (the "August/11 Gold Purchase Agreement") is in the amount of US $120,000,000 and is governed by the laws of the Province of Ontario and the federal laws of Canada.

17.    Under the August/11 Gold Purchase Agreement, Deutsche Bank effectively pre-paid $690 per ounce for the 173,880 ounces of gold to be purchased over the life of the contract.  Between September 2011 and August 2015, Deutsche Bank is to receive 4,330 ounces of gold each month.  In exchange for the gold delivery, Deutsche Bank is to pay the market price, less $850 per ounce, with the maximum price to be paid by Deutsche Bank capped at $1,950 per ounce.  The August/11 Gold Purchase Agreement also requires Veris USA to maintain a reserve account balance for the first month through the eighteenth month of the agreement in the amount of US $10,000,000.  There is currently US $2,000,000 in the reserve account balance.

18.    As security for the obligations under the August/11 Gold Purchase Agreement, Deutsche Bank was granted the following security package:  (a) a security agreement providing for liens on all of Veris USA's personal property wherever located; (b) a deed of trust charging Veris USA's claim rights and all personal property; (c) the assignment of leases and rents and fixture filing granted by Veris USA; (d) the guarantees by VGC, Ketza and Queenstake secured by security agreements charging all personal property of VGC and Queenstake; and (e) a pledge of shares of Veris USA, Ketza and Queenstake.  The foregoing security includes the Veris Gold Group's mining properties and, in particular, the Veris USA properties.

19.    Veris USA also entered into a second forward gold purchase agreement dated February 7, 2012 with Deutsche Bank (the "February/12 Gold Purchase Agreement," with the August/11 Gold Purchase Agreement, the "Purchase Agreements") in the amount of US $20,000,000, which is also governed by the laws of the Province of Ontario and the federal laws of Canada.  Pursuant to the February/12 Gold Purchase Agreement, Deutsche Bank received 40,000,000 warrants to purchase 40,000,000 common shares of VGC at an exercise price of $4.40 per common share.  Between March 2012 and September 2015, Deutsche Bank is to receive 650 ounces of gold per month.  In exchange for

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

the gold delivery, Deutsche Bank is to pay the spot price, less $850 per ounce, with the maximum market price to be paid by Deutsche Bank capped at $1,750 per ounce. The security provided for the February/12 Gold Purchase Agreement is the same security as the one was provided in the August/11 Gold Purchase Agreement.

*General Unsecured Claims*

20.     The Debtors have also entered into (i) three convertible debentures with Whitebox Advisors for a respective amount of US $5 million, US $4 million and US $2 million, (ii) a senior unsecured promissory note with 683 Capital in an approximate amount of US $10 million, (iii) a forward gold loan with Monument Mining in an approximate amount of $5.65 million, and (iv) a forward gold loan with Concept Capital in an approximate amount of $17.3 million. The amount of the trade payables for the Debtors is approximately $65 million.

21.     Small Mine Development LLC ("Small Mine"), is the underground mine contractor for the Jerritt Canyon property and is owed approximately US $42,000,000 of which US $15,000,000 is over one year past due. Small Mine continues to provide services to Veris USA. Small Mine employs about 150 people on site.

22.     As of March 31, 2014, the Debtors have total consolidated assets with a net book value of approximately US $323,000,000, including consolidated current assets of US $38,000,000, and consolidated non-current assets of approximately US $285,000,000. As of March 31, 2014, the Debtors have consolidated liabilities with a net book value of approximately US $282,000,000, including consolidated current liabilities of US $215,000,000 and consolidated non-current assets of approximately US $67,000,000.

**III.     Events Giving Rise to the Debtors' Restructuring**

23.     The Debtors are currently facing financial difficulty because they lack adequate liquidity to satisfy their long term debt obligations. The existing payment terms to Deutsche Bank and the subordinated debt-holders have placed a significant strain on the Debtors' free cash flow. During the last year, the Debtors' management has pursued a wide variety of cost reduction, financing, and cash generation alternatives in an effort to address the short and long-term liquidity issues of the Debtors. The restructuring initiatives, cost reduction, financing and strategic alternatives included reducing the

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

fixed and operational costs at the Gold Mine, staff reduction, salary and wage reductions, and reduction of employee benefits.  In addition, over the past year, the Debtors engaged a number of independent advisors to assist in refinancing the terms of existing debt facilities to better fund its working capital needs.

24.    On January 28, 2014, February 6, 2014, March 6, 2014, April 4, 2014 and May 7, 2014, Deutsche Bank sent to Veris USA Notices of Defaults under the Purchase Agreements.  Due to the alleged events of default under the Purchase Agreements, the Debtors accelerated plans for refinancing their capital structure through the appointment of a Special Committee comprised of two independent and one non independent director with the mandate to review all options and work with the appointed advisor, Raymond James, to develop and explore various alternatives.

25.    The Debtors have tried unsuccessfully to extend the terms of the existing facilities with Deutsche Bank or otherwise refinance on longer terms and possibly negotiate better terms with the subordinated debt-holders.

26.    On June 3, 2014, Deutsche Bank sent to Veris USA a Notice of Early Termination Date Under the First Forward Agreement and the Second Forward Agreement stating that (i) Deutsche Bank did not receive the Scheduled Monthly Quantity of Gold, as such term is defined in the Purchase Agreements, since December 2013, (ii) Deutsche Bank designates June 3, 2014 as the Early Termination Date under both Purchase Agreements, and (iii) Deutsche Bank requests payment of Early Termination Amount in the respective amount of US $12,204,978.98 and US $77,239,320.56 under the Purchase Agreements by June 9, 2014 at 5:00 p.m. Pacific Time.

IV.    **The Canadian Proceeding**

27.    To preserve enterprise value and to prevent depletion of the estate, the Debtors commenced the Canadian Proceeding pursuant to the CCAA, which is Canada's corporate reorganization law. The CCAA is a federal statute that provides financially-troubled companies the opportunity to restructure their affairs.  By allowing a company to restructure its financial affairs, through a formal "plan of arrangement," the CCAA presents an opportunity for troubled businesses to avoid liquidation and allows such businesses' creditors to receive some distribution for outstanding amounts owing to them, by preserving the going-concern value of the company.  The Debtors believe

ACTIVE 25934136v1 00/00/0000

they would be unable to service and repay their debts under the Purchase Agreements and other outstanding obligations outside of a court-supervised process under the CCAA.

28.     Proceedings under the CCAA are commenced by filing a written petition in a court with jurisdiction over the applicable debtor entity. Here, the Debtors filed their petition in the Supreme Court of British Columbia, Vancouver Registry in Canada, which had jurisdiction over the Debtors.

29.     Proceedings under the CCAA are similar in many respects to proceedings under chapter 11 of the Bankruptcy Code. However, in contrast to chapter 11 proceedings, reorganizations under the CCAA occur under the supervision of a court-appointed Monitor, an independent third-party that observes a CCAA debtor's ongoing operations and assists with formulating a plan of arrangement. A Monitor's duties generally include supervising the debtor's business and affairs, reporting to the court on major events that could impact the viability of the debtor, assisting the debtor in the preparation of a plan of arrangement, notifying creditors (and shareholders) of any meetings and tabulating votes as such creditor and shareholder meetings. In addition, the Monitor also prepares a report on the plan of arrangement that generally is included in the mailing of the plan to creditors and shareholders.

30.     On June 9, 2014, the Canadian Court appointed E&Y as the Debtors' Monitor in the Canadian Proceeding and specifically authorized the Foreign Representative to commence these chapter 15 cases.  See order entered on June 9, 2014 (the "Initial Order"), a true and correct copy of which is attached hereto as Exhibit 1.

**V.     The Canadian Proceeding Is a Foreign Main Proceeding**

31.     As noted above, the Debtors require the protections afforded to foreign debtors pursuant to chapter 15 of the Bankruptcy Code in order to ensure the success of its restructuring and protect the Debtors' assets in the United States.

32.     Under the CCAA, upon the appointment of a Monitor, the Monitor undertakes various supervisory duties with respect to a debtor's businesses. The Monitor has the authority to assist in the formulation of a plan of arrangement that ultimately will bind creditors to a particular restructuring strategy and also generally has authority to seek ancillary recognition orders in non-Canadian jurisdictions. Further, under the CCAA, a Canadian court can appoint a Monitor or the debtor itself to commence ancillary proceedings in other jurisdictions to protect a debtor's non-Canadian based assets.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

In the Canadian Proceeding, the Canadian Court has appointed E&Y as the Monitor and has authorized E&Y to commence these chapter 15 cases. Accordingly, to the best of my knowledge and belief, I believe that E&Y, as an appointed Monitor in the Canadian Proceeding, is a "foreign representative" as defined by section 101(24) of the Bankruptcy Code.

33.    Further, to the best of my knowledge and belief, the Canadian Proceeding is a collective judicial proceeding under Canadian law in which Debtors' assets are subject to the supervision of the Canadian Court for the purpose of reorganization.  Accordingly, to the best of my knowledge and belief, the Canadian Proceeding is a "foreign proceeding" as defined by section 101(23) of the Bankruptcy Code.

34.    Moreover, to the best of my knowledge and belief, the Canadian Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code, as each of the Debtors has its center of main interest ("COMI") in Canada. The official corporate headquarters for all of the Debtors is located at 900-688 West Hastings Street, Vancouver BC V6B 1P1, Canada.  In addition:

a.    all of the Debtors (except for Queenstake) have funds in bank accounts at the Toronto Dominion Bank, Whitehorse Branch;

b.    the management of the Debtors is located in the VGC head office in Vancouver, British Columbia;

c.    Veris USA management staff report directly to, and take direction from, VGC on issues affecting the operations and business activities of Veris USA;

d.    corporate governance for the Debtors is directed from Vancouver, British Columbia;

e.    strategic and key operational decisions and key policy decisions for the Debtors are made by senior management located in Vancouver, British Columbia;

f.    the Debtors' tax, treasury, and cash management functions are managed from Vancouver, British Columbia;

9

g.    except for payroll functions for Veris USA, the Debtors' human resources functions are managed from Vancouver, British Columbia and all senior human resources staff in the United States report into Vancouver, British Columbia;

h.    the Veris Gold Group's information technology and systems are directed from Vancouver, British Columbia;

i.    all public company reporting and investor relations are conducted from Vancouver, British Columbia; the finance function for the Veris Gold Group is conducted from Vancouver, British Columbia;

j.    the finance function for the Debtors is conducted from Vancouver, British Columbia

k.    the principle debt obligations of the Debtors with Deutsche Bank are governed by the laws of the Province of Ontario and the Federal laws of Canada; and

l.    Ketza maintains a gold and silver exploration company, and owns land claims, in the Yukon Territory of Canada.

35.    In addition, substantially all of the books and records of the Debtors are maintained by the Debtors in Vancouver. Further, the working capital and funding needs of the Debtors are satisfied by sources of funds directed from Canada and approved by Canadian-based managers.

36.    Moreover, both the United States and Canadian-based Debtors are closely integrated into, and indeed, reliant upon the Canadian-based Veris business. The cash management and other banking arrangements for the group of entities are integrated.

37.    Further, the key contractual relationships of the Debtor entities are closely tied to Canada. Most of the key contracts, including the Purchase Agreements, are governed by Canadian law. Due to the integrated nature of these arrangements, the banking and financing of the Debtors' United States and Canadian subsidiaries cannot easily be separated.

38.    As identified in the *Declaration of Shaun Heinrichs Pursuant to 11 U.S.C. § 1515 and Rule 1007(a) (4) of the Federal Rules of Bankruptcy Procedure*, filed contemporaneously herewith, other than these chapter 15 cases, the Canadian Proceeding is the only insolvency proceeding pending

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

for the Debtors and, therefore, is the only "foreign proceeding" with respect to the Debtors within the meaning of section 101(23) of the Bankruptcy Code.

39.     Additionally, I understand that a statement identifying all foreign proceedings with respect to the Debtor has been filed with this Court. Accordingly, I believe that the Petition meets the requirements of section 1515 of the Bankruptcy Code for recognition of the Canadian Proceeding as a foreign main proceeding.

**VI.     Risk of Cash Flow Disruption**

40.     Other than Deutsche Bank, the Veris Gold Group primarily relies upon a single gold purchaser (Auramet), who historically has provided the Veris Gold Group with payments on a "net 10" basis—i.e. the Debtors have up to ten (10) days after payment to deliver the gold.   However, if there is a risk that Deutsche Bank will seize the gold during the period between payment and delivery, then Auramet likely will not continue to make payments on a "net 10" basis and instead will insist on "cash on delivery" or even cash up-front terms.  Even if the Veris Gold Group and the Monitor could find another purchaser willing to provide more favorable terms (which would be unlikely under the threat of a Deutsche Bank seizure), I believe that it would take several days (if not weeks) to source and negotiate the terms of an alternative purchasing arrangement.  Therefore, I believe that the mere threat of Deutsche Bank seizing gold will cause severe cash flow disruptions for the Veris Gold Group.

41.     If the Veris Gold Group's cash flow is disrupted even for a short amount of time, then there is a significant risk of a cascade effect that would threaten the Veris Gold Group's viability and enterprise value.

42.     The operations of the Veris Gold Group cannot be maintained without its workforce and several key providers of supplies and services.  These key suppliers and service providers can generally be described as:

    a.     reagent suppliers

    b.     mining contractors

    c.     utilities

    d.     fuel suppliers

    e.     coal suppliers

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

43.     Many of these items recur on a weekly basis, such as the need to purchase supplies like cyanide, fuel, cement and soda ash.   These supplies (and others) are crucial to maintaining the Debtors' operations—without cyanide the Debtors cannot strip gold from carbon in the milling process, without cement the Debtors cannot backfill and support the mines, without fuel the Debtors cannot move products in and out of the mines and run generators, without soda ash the Debtors cannot smelt the gold, and without employees the Debtors cannot operate.

44.     The Veris Gold Group is aware that a number of its key suppliers may suffer serious if not irreparable financial hardship if those suppliers do not receive timely payments.

45.     The Veris Gold Group will work with the Monitor to identify a list of suppliers that are key to the business and to the continued operations of the Veris Gold Group.

46.     In doing so, the Veris Gold Group and the Monitor will consider various factors in determining these key suppliers.  These factors will include the importance of the supplier to the Veris Gold Group's operation, the nature of the goods or services supplied and whether there are alternative supply sources, the ability of the supplier to remain in business or continue normal operations if not paid, the ability and the likelihood that the supplier may delay or otherwise restrict supply and services in the event of non-payment, the volume of the goods or services supplied, potential for disruption to the Veris Gold Group's operation if supplier delays or fails to expedite supply of goods or services pursuant to their existing contracts, the ability of the supplier to maintain a possessory lien on the property and the amount the Veris Gold Group currently owes to each supplier.

47.     It is my understanding that a stay of proceedings may require suppliers to continue supplying goods and services but will not allow the Veris Gold Group to require expedited supply from its suppliers or require suppliers to extend credit.  Furthermore, it is my understanding that without approval from the Court, amounts owing to suppliers representing pre-filing debt cannot be paid.

48.     As a result of these unique circumstances, the Veris Gold Group is seeking approval of the Court to allow it to pay certain pre-filing amounts but only with Monitor approval.  I understand that a number of the Veris Gold Group's key suppliers are in a fragile financial state and that any stay of proceedings that results in these suppliers not being paid certain pre-filing amounts outstanding could result in these suppliers suffering financial distress and an inability to supply even if ordered to do so.

ACTIVE 25934136v1 00/00/0000

49.     The Veris Gold Group relies on an extensive interwoven network of suppliers and service providers to ensure the continuance of its business.  A number of these suppliers, particularly those in the USA who may not be subject to the terms of this Order, may insist upon payment of amounts owing from the Veris Gold Group prior to the Veris Gold Group obtaining CCAA protection (if said protection is granted) or, if unpaid, will likely require a continuing supply of cash on delivery terms to continue to supply, which, owing to the nature of the business, are either extremely cumbersome or simply not tenable.

50.     For a number of suppliers, given the quantity of product and the general delivery process, cash-on-delivery arrangements may be unworkable.  The amounts to be paid to the suppliers can often only be established once the product has arrived at the mine.  The payment of certain pre-petition amounts (if consented to by the Monitor) will permit the Veris Gold Group to make arrangements with the suppliers that will ensure the continuation of supply.  The Veris Gold Group intends to rely upon those suppliers with which it had contracts that were entered into prior to the filing of the Petition.

51.     The Veris Gold Group requires the ability to pay certain pre and post-filing payables to those suppliers it considers essential as confirmed by the Monitor.  In the event the Veris Gold Group encounters supplier issues post filing, the Veris Gold Group, with the approval of the Monitor, may enter into arrangements with other suppliers which could involve some pre-filing payables.  The Veris Gold Group is aware of the potential prejudice to other creditors for making these payments and intends to keep them to a required minimal level.  However, this proposal is specifically designed to maintain efficient operations.

52.     The Veris Gold Group believes a combination of a reduced debt load and additional equity would see Veris Gold Group being put back on a solid financial footing.

53.     Because the Veris Gold Group's constant need to maintain their workforce and obtain supplies implicates safety, environmental and regulatory concerns, even a brief disruption in the Veris Gold Group's ability to fund these crucial expenses could shut down operations.  Due to the nature of the particular regulatory, environmental and other factors that are involved in the Debtors' mining operations, once a shut-down occurs I believe that it it could be difficult or impossible to restart

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

operations.  Thus, I believe that a disruption in the Debtors' cash flow, thereby resulting in a disruption in the Debtors' ability to fund key operating expenses, could immediately and catastrophically destroy the Debtors' going concern value to the extreme prejudice of the Debtors' creditors.  I believe that the same is true with respect to other collection remedies that Deutsche Bank might attempt to exercise against the Debtors' mining operations and related assets.

54.     In order to avoid possible enforcement proceedings by creditors, and other potential events that could harm its business, Veris Gold Group requires the protection afforded by a stay of proceedings to permit it to implement a restructuring for the benefit of all stakeholders.

55.     The Veris Gold Group believes the best way to preserve enterprise value for the Veris Gold Group and its stakeholders is for an Initial Order to be granted and a restructuring to be pursued through a plan under the CCAA.

**VII.    Proposed Monitor**

56.     The Veris Gold Group has retained Ernst & Young Inc. ("E&Y") to act as the Monitor in this CCAA filing and to assist the Veris Gold Group in both understanding the CCAA process and preparing a Plan.

57.     Subject to Court approval, E&Y has consented to act as the Monitor of the Petitioners in this CCAA proceeding and, in my view, is a fit and proper organization to do so.

58.     At no time in the past two years has E&Y or any of its partners or managers been the Veris Gold Group auditor, accountant or employee of the auditor, accountant for the Veris Gold Group. E&Y is independent from the Veris Gold Group's financial advisor, Raymond James.

Cash Flow Forecast

59.     Veris Gold Group with the assistance of the proposed Monitor has prepared a cash flow forecast through September 5, 2014 (the "Cash Flow Forecast").  Attached as Exhibit "2" is a copy of the Cash Flow Forecast.

60.     As set out in the Cash Flow Forecast, (a) the primary source of Veris Gold Group's working capital is gold sales, and (b) Veris Gold Group's principal uses of cash during the next thirteen weeks would consist of payment of ongoing costs of day to day operations and professional fees and disbursements in connection with the CCAA proceedings.

ACTIVE 25934136v1 00/00/0000

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

61.     I have reviewed the Cash Flow Forecast with the Monitor.  I believe that the Cash Flow Forecast is reasonable in the circumstances and I also believe, based on my discussions with representatives of the Monitor that the Monitor is of also of the view, given the information provided by Senior Management to support the Cash Flow Forecast, that the Cash Flow Forecast appears reasonable under the circumstances.

62.     Based on the Cash Flow Forecast, absent precipitous action by Deutsche Bank, I believe that the Veris Gold Group's mining operations are stable and  I do not believe the Veris Gold Group's assets are not in any other imminent danger of losing significant value.

**VIII.   Interim Financing**

63.     In light of the Cash Flow Forecast, interim financing is not required at this time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed on this June 9, 2014

Reno, Nevada



_/s/Shaun Heinrichs_____
Shaun Heinrichs
Chief Financial Officer
Veris Gold Corp.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

**INITIAL ORDER**

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

S - 144431

No. _____
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND

IN THE MATTER OF THE *CANADA BUSINESS CORPORATIONS ACT*,
R.S.C. 1985, c. C-44

AND

IN THE MATTER OF THE *BUSINESS CORPORATIONS ACT*,
S.B.C. 2002, c.57

AND

IN THE MATTER OF VERIS GOLD CORP., QUEENSTAKE RESOURCES LTD.,
KETZA RIVER HOLDINGS LTD., and VERIS GOLD U.S.A., INC.

PETITIONERS

**INITIAL ORDER**

BEFORE THE HONOURABLE          )
                               )      09/JUN/2014
MADAM JUSTICE FITZPATRICK      )
                               )

THE APPLICATION of the Petitioners coming on for hearing at Vancouver, British Columbia, on the 9th day of June, 2014 (the "**Order Date**"); AND ON HEARING Magnus Verbrugge and William Skelly, counsel for the Petitioners and those other counsel listed on Schedule "A" hereto; AND UPON READING the material filed, including the First Affidavit of Shaun Heinrichs sworn June 8, 2014, the First Affidavit of Elly Bahrami sworn June 9, 2014; AND pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36 as amended (the "**CCAA**"), the British Columbia Supreme Court Civil Rules and the inherent jurisdiction of this Honourable Court;

- 2 -

THIS COURT ORDERS AND DECLARES THAT:

**JURISDICTION**

1.      The Petitioners are companies to which the CCAA applies.

**SUBSEQUENT HEARING DATE**

2.      The hearing of the Petitioners' application for an extension of the Stay Period (as defined in paragraph 16 of this Order) and for any ancillary relief shall be held at the Courthouse at 800 Smithe Street, Vancouver, British Columbia at 9:45am on Tuesday, the 8th day of July 2014,  or such other date as this Court may order.

**PLAN OF ARRANGEMENT**

3.      The Petitioners shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (the "**Plan**").

**POSSESSION OF PROPERTY AND OPERATIONS**

4.      Subject to this Order and any further Order of this Court, the Petitioners shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"), and continue to carry on its business (the "**Business**") in the ordinary course and in a manner consistent with the preservation of the Business and the Property.  The Petitioners shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants,  counsel and such other persons (collectively,  "**Assistants**") currently retained or employed by it, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for carrying out the terms of this Order.

**CASH MANAGEMENT SYSTEM**

5.    The Petitioners shall be entitled to continue to utilize the central cash management system currently in place as described in the Affidavit of Shaun Heinrichs sworn June 8, 2014 or replace it with another substantially similar central cash management system (the "**Cash Management System**") and that any present or future bank providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Petitioners of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Petitioners, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.    Subject to the consent of the Monitor, the Petitioners shall be entitled, but not required, to pay the following expenses which may have been incurred prior to the Order Date:

(a)    all outstanding wages, salaries, employee and pension benefits (including long and short term disability payments), vacation pay and expenses (but excluding severance pay) payable before or after the Order Date, in each case incurred in the ordinary course of business and consistent with the relevant compensation policies and arrangements existing at the time incurred (collectively "**Wages**");

(b)    all amounts owing to or in respect of individuals working as independent contractors in connection with the Petitioners' Business;

(c)    the fees and disbursements of any Assistants retained or employed by the Petitioners or the Monitor which are related to the Petitioners' restructuring, at their standard rates and charges, including payment of the fees and disbursements

- 4 -

of legal counsel retained by the Petitioners, the Monitor and the Directors, whenever and wherever incurred, in respect of:

(i)    these proceedings or any other similar proceedings in other jurisdictions in which the Petitioners or any subsidiaries or affiliated companies of the Petitioners are domiciled;

(ii)    any litigation in which the Petitioners are named as a party or is otherwise involved, whether commenced before or after the Order Date; and

(iii)    any related corporate matters; and,

(d)    all amounts owing for goods and services actually supplied, both prior to and subsequent to the Order Date, to the Petitioners:

(i)    by reagent suppliers, mining contractors, utilities, fuel suppliers and coal suppliers with the prior consent of the Monitor, if, in the opinion of the Petitioners and the Monitor the supplier is critical to the business and ongoing operations of any of the Petitioners and the payment is required to ensure ongoing supply;

(ii)    by freight and logistics suppliers, third party customs brokers, agents, freight carriers, freight forwarders, warehousemen and shippers with the prior consent of the Monitor, if, in the opinion of the Petitioners and the Monitor, the party providing the good or service is critical to the business and ongoing operations of any of the Petitioners and the payment is required to ensure ongoing supply;

(iii)    by other parties providing goods or services with the prior consent of the Monitor, if, in the opinion of the Petitioners and the Monitor the supplier or service provider is critical to the Business and ongoing operations of any of the Petitioners and the payment is required to ensure ongoing supply;

- 5 -

(e)    with the prior consent of the Monitor, all amounts owing to creditors who, prior to the Order Date, lawfully retained Property or exercised valid and enforceable possessory liens against any asset of the Petitioners where the value of such asset exceeds the amount of the possessory or statutory liens or where the asset is deemed critical by the Petitioners and the Monitor to the Business of the Petitioners; and,

(f)    any amounts payable in respect of customs and duties.

7.    The Petitioners shall be subrogated to the rights of any creditor receiving payment pursuant to paragraph 6(d), 6(e) and 6(f) of this Order in the amount of the payment(s) (the total amount paid to such party constituting a **"Critical Supplier Claim"**). Each such Critical Supplier Claim shall be deemed to be assigned to the Petitioners for all purposes and the Petitioners shall be entitled to vote the Critical Supplier Claims in any Plan.

8.    Except as otherwise provided herein, the Petitioners shall be entitled to pay all expenses reasonably incurred by the Petitioners in carrying on the Business in the ordinary course following the Order Date, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably incurred and which are necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors' and officers' insurance), maintenance and security services, provided that any capital expenditure exceeding $150,000 shall be approved by the Monitor;

(b)    all obligations incurred by the Petitioners after the Order Date, including without limitation, with respect to goods and services actually supplied to the Petitioners following the Order Date (including those under purchase orders outstanding at the Order Date but excluding any interest on the Petitioners' obligations incurred prior to the Order Date); and

- 6 -

(c)     fees and disbursements of the kind referred to in paragraph 6(c) which may be incurred after the Order Date.

9.     The Petitioners are authorized to remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from Wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes or any such claims which are to be paid pursuant to Section 6(3) of the CCAA;

(b)     all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Petitioners in connection with the sale of goods and services by the Petitioners, but only where such Sales Taxes accrue or are collected after the Order Date, or where such Sales Taxes accrued or were collected prior to the Order Date but not required to be remitted until on or after the Order Date; and

(c)     any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal property taxes, municipal business taxes or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors.

10.     Until such time as a real property lease is disclaimed in accordance with the CCAA, the Petitioners shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable as rent to the landlord under the lease) based on the terms of existing lease arrangements or as otherwise may be negotiated between the Petitioners and the landlord from time to time ("**Rent**"), for the period commencing from and including the Order Date, twice-monthly in equal payments on the first and fifteenth day of the month in advance (but not

in arrears). On the date of the first of such payments, any Rent relating to the period commencing from and including Order Date shall also be paid.

11. Except as specifically permitted herein, the Petitioners are hereby directed, until further Order of this Court:

(a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Petitioners to any of its creditors as of the Order Date except as authorized by this Order;

(b) to make no payments in respect of any financing leases which create security interests;

(c) to grant no security interests, trust, mortgages, liens, charges or encumbrances upon or in respect of any of its Property, nor become a guarantor or surety, nor otherwise become liable in any manner with respect to any other person or entity except as authorized by this Order;

(d) to not grant credit except in the ordinary course of the Business only to its customers for goods and services actually supplied to those customers, provided such customers agree that there is no right of set-off in respect of amounts owing for such goods and services against any debt owing by the Petitioners to such customers as of the Order Date; and

(e) to not incur liabilities except in the ordinary course of Business.

## RESTRUCTURING

12. Subject to such requirements as are imposed by the CCAA, the Petitioners shall have the right to:

(a) permanently or temporarily cease, downsize or shut down all or any part of their Business or operations and commence marketing efforts in respect of any of redundant or non-material assets and to dispose of redundant or non-material assets not exceeding $50,000 in any one transaction or $250,000 in the aggregate;

- 8 -

(b)   terminate the employment of such of their employees or temporarily lay off such of their employees as they deem appropriate;

(c)   disclaim, in whole or in part, with the prior consent of the Monitor or further Order of the Court, such of their arrangements or agreements of any nature whatsoever with whomsoever, whether oral or written, as the Petitioners deem appropriate, in accordance with Section 32 of the CCAA, with such disclaimers to be on such terms as may be agreed upon between the Petitioners and such counter-parties or, failing such agreement, to deal with the consequences thereof in the Plan; and

(d)   pursue all avenues of refinancing for its Business or Property, in whole or part;

all of the foregoing to permit the Petitioners to proceed with an orderly restructuring of the Business (the "**Restructuring**").

13.   The Petitioners shall provide each of the relevant landlords with notice of the Petitioners' intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal.  The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Petitioners' entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors who claim a security interest in the fixtures, such landlord and the Petitioners, or by further Order of this Court upon application by the Petitioners, the landlord or the applicable secured creditors on at least two (2) clear days' notice to the other parties.  If a Petitioner disclaims the lease governing such leased premises in accordance with Section 32 of the CCAA, it shall not be required to pay Rent under such lease pending resolution of any dispute concerning such fixtures (other than Rent payable for the notice period provided for in Section 32(5) of the CCAA), and the disclaimer of the lease shall be without prejudice to the Petitioners claim to the fixtures in dispute.

14.   If a notice of disclaimer is delivered pursuant to Section 32 of the CCAA, then: (a) during the period prior to the effective time of the disclaimer, the landlord may show the affected leased

premises to prospective tenants during normal business hours on giving the Petitioners and the Monitor 24 hours' prior written notice; and (b) at the effective time of the disclaimer, the landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims the landlord may have against the Petitioners, or any other rights the landlord might have, in respect of such lease or leased premises and the landlord shall be entitled to notify the Petitioners of the basis on which it is taking possession and gain possession of and re-lease such leased premises to any third party or parties on such terms as the landlord considers advisable, provided that nothing herein shall relieve the landlord of its obligation to mitigate any damages claimed in connection therewith.

15.     Pursuant to Section 7(3)(c) of the *Personal Information Protection and Electronics Documents Act*, S.C. 2000, c. 5 and Section 18(1)(o) of the *Personal Information Protection Act*, S.B.C. 2003, c. 63, and any regulations promulgated under authority of either Act, as applicable (the "**Relevant Enactment**"), the Petitioners, in the course of these proceedings, is permitted to, and hereby shall, disclose personal information of identifiable individuals in its possession or control to stakeholders, its advisors, prospective investors, financiers, buyers or strategic partners (collectively, "**Third Parties**"), but only to the extent desirable or required to negotiate and complete the Restructuring or to prepare and implement the Plan or transactions for that purpose; provided that the Third Parties to whom such personal information is disclosed enter into confidentiality agreements with the Petitioners binding them in the same manner and to the same extent with respect to the collection, use and disclosure of that information as if they were an organization as defined under the Relevant Enactment, and limiting the use of such information to the extent desirable or required to negotiate or complete the Restructuring or to prepare and implement the Plan or transactions for that purpose, and attorning to the jurisdiction of this Court for the purposes of that agreement.  Upon the completion of the use of personal information for the limited purposes set out herein, the Third Parties shall return the personal information to the Petitioners or destroy it.   If the Third Parties acquire personal information as part of the Restructuring or the preparation and implementation of the Plan or transactions in furtherance thereof, such Third Parties may, subject to this paragraph and any Relevant Enactment, continue to use the personal information in a manner which is in all respects identical to the prior use thereof by the Petitioners.

- 10 -

## STAY OF PROCEEDINGS, RIGHTS AND REMEDIES

16.     Until and including July 8, 2014, or such later date as this Court may order (the "**Stay Period**"), no action, suit or proceeding in any court or tribunal (each, a "**Proceeding**") against or in respect of the Petitioners or the Monitor, or affecting the Business or the Property, shall be commenced or continued except with the written consent of the Petitioners and the Monitor or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Petitioners or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

17.     During the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Petitioners or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Petitioners and the Monitor or leave of this Court.

18.     During the Stay Period, Deutsche Bank AG ("**Deutsche Bank**") is prohibited, stayed and restrained from exercising any rights of realization against the Property. ✱

19.      Nothing in this Order, including paragraphs 16, 17 and 18, shall: (i) empower the Petitioners to carry on any business which the Petitioners are not lawfully entitled to carry on; (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA; (iii) prevent the filing of any registration to preserve or perfect a mortgage, charge or security interest (subject to the provisions of Section 39 of the CCAA relating to the priority of statutory Crown securities); or (iv) prevent the registration or filing of a lien or claim for lien or the commencement of a Proceeding to protect lien or other rights that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such lien, claim for lien or Proceeding except for service of the initiating documentation on the Petitioners.

✱; provided that this paragraph 18 shall be without prejudice to the right of Deutsche Bank to apply to lift the stay of proceedings or to seek a declaration of this court that it is not so prohibited, stayed or restrained to the extent that any of its agreements with the Petitioners are declared to be "eligible financial contracts" as defined in the CCAA.   A.-

**NO INTERFERENCE WITH RIGHTS**

20.     During the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Petitioners, except with the written consent of the Petitioners and the Monitor or leave of this Court.

**CONTINUATION OF SERVICES**

21.     During the Stay Period, all Persons having oral or written agreements with the Petitioners or mandates under an enactment for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, services, utility or other services to the Business or the Petitioners, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with, or terminating the supply of such goods or services as may be required by the Petitioners, and that the Petitioners shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the Order Date are paid by the Petitioners in accordance with normal payment practices of the Petitioners or such other practices as may be agreed upon by the supplier or service provider and the Petitioners and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

22.     Notwithstanding any provision in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the Order Date, nor shall any Person be under any obligation to advance or re-advance any monies or otherwise extend any credit to the Petitioners on or after the Order Date. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

- 12 -

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

23.    During the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against the directors or officers of the Petitioners with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Petitioners whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Petitioners, if one is filed, is sanctioned by this Court or is refused by the creditors of the Petitioners or this Court. Nothing in this Order, including in this paragraph, shall prevent the commencement of a Proceeding to preserve any claim against a director or officer of the Petitioners that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such Proceeding except for service of the initiating documentation on the applicable director or officer.

## DIRECTORS AND OFFICERS INDEMNIFICATION AND CHARGE

24.    The Petitioners shall indemnify its directors and officers against obligations and liabilities that they may incur as directors or officers of the Petitioners after the commencement of the within proceedings, except to the extent that, with respect to any director or officer, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

25.    The directors and officers of the Petitioners shall be entitled to the benefit of and are hereby granted a charge (the **"Directors' Charge"**) on the Property, which charge shall not exceed an aggregate amount of $500,000, as security for the indemnity provided in paragraph 24 of this Order.  The Directors' Charge shall have the priority set out in paragraph 37 herein.

26.    Notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) the Petitioners' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy,

or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 24 of this Order.

**APPOINTMENT OF MONITOR**

27.    Ernst & Young Inc. is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Petitioners with the powers and obligations set out in the CCAA or set forth herein, and that the Petitioners and its shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Petitioners pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

28.    The Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)    monitor the Petitioners' receipts and disbursements;

(b)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(c)    assist the Petitioners, to the extent required by the Petitioners, in its dissemination of information to parties, including a lender providing debtor-in-possession financing, should such financing be obtained;

(d)    advise the Petitioners in its preparation of the Petitioners' cash flow statements which information shall be reviewed with the Monitor;

(e)    advise the Petitioners in its development of the Plan and any amendments to the Plan;

- 14 -

(f)    assist the Petitioners, to the extent required by the Petitioners, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan;

(g)    have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Petitioners, to the extent that is necessary to adequately assess the Petitioners' business and financial affairs or to perform its duties arising under this Order;

(h)    be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order;

(i)    provide information and report to Deutsche Bank as may be reasonably requested by Deutsche Bank or the Petitioners from time to time; and

(j)    perform such other duties as are required by this Order or by this Court from time to time.

29.    The Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, or by inadvertence in relation to the due exercise of powers or performance of duties under this Order, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof, and nothing in this Order shall be construed as resulting in the Monitor being an employer or a successor employer, within the meaning of any statute, regulation or rule of law or equity, for any purpose whatsoever.

30.    Nothing herein contained shall require or allow the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other

contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Fisheries Act*, the British Columbia *Environmental Management Act*, the British Columbia *Fish Protection Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. For greater certainty, the Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

31.    The Monitor shall provide any creditor of the Petitioners with information provided by the Petitioners in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Petitioners is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Petitioners may agree.

32.    In addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the rights and protections afforded the Monitor by the CCAA or any applicable legislation.

**ADMINISTRATION CHARGE**

33.    The Monitor, counsel to the Monitor, if any, and counsel to the Petitioners shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the Petitioners as part of the cost of these proceedings. The Petitioners are hereby authorized and directed to pay the accounts of the Monitor, counsel to the Monitor and counsel to the Petitioners on a periodic basis and, in addition, the Petitioners are hereby authorized to pay to the Monitor, counsel to the Monitor, and counsel to the Petitioners, retainers in the aggregate amount of

- 16 -

$475,000 to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

34.     The Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the British Columbia Supreme Court and may be heard on a summary basis.

35.     The Petitioners are authorised to continue the engagement of Raymond James & Associates Inc. ("**Raymond James**") as financial advisor to the Petitioners and Raymond James shall be paid its reasonable fees and disbursements in accordance with the terms agreed between the Petitioners and Raymond James (the "**Raymond James Engagement Letter**").

36.     The Monitor, counsel to the Monitor, if any, counsel to the Petitioners  and Raymond James shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of $1,500,000, as security for their respective fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel or, in the case of Raymond James, in accordance with the terms of the Raymond James Engagement Letter, both before and after the making of this Order which are related to the Petitioners' restructuring.  The Administration Charge shall have the priority set out in paragraphs 37 and herein.

## VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER

37.     The priorities of the Administration Charge and the Directors' Charge and as among them shall be as follows:

     First – Administration Charge (to the maximum amount of $1,500,000);

     Second -  Directors' Charge (to the maximum amount of $500,000).

38.     Any security documentation evidencing, or the filing, registration or perfection of, the Administration Charge and the Directors' Charge (together, the "**Charges**") shall not be required, and that the Charges shall be effective as against the Property and shall be valid and

enforceable for all purposes, including as against any right, title or interest filed, registered or perfected subsequent to the Charges coming into existence, notwithstanding any failure to file, register or perfect any such Charges.

39.    Each of the Administration Charge and the Directors' Charge (all as constituted and defined herein) shall constitute a mortgage, security interest, assignment by way of security and charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, mortgages, charges and encumbrances and claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**"), in favour of any Person.

40.    Except as otherwise expressly provided herein, or as may be approved by this Court, the Petitioners shall not grant or suffer to exist any Encumbrances over any Property that rank in priority to, or *pari passu* with the Charges, unless the Petitioners obtains the prior written consent of the Monitor and the beneficiaries of the Administration Charge and the Director's Charge.

41.    The Administration Charge and the Director's Charge  shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to the BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; or (d) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, mortgage, security agreement, debenture, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Petitioners; and notwithstanding any provision to the contrary in any Agreement:

     (a)    the creation of the Charges shall not create or be deemed to constitute a breach by the Petitioners of any Agreement to which it is a party; and

(b)    the payments made by the Petitioners pursuant to this Order and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

42.    Any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Petitioners' interest in such real property leases.

## SERVICE AND NOTICE

43.    The Monitor shall (i) without delay, publish in the National Post, the Vancouver Sun and the Reno Gazette Journal a notice containing the information prescribed under the CCAA, (ii) within five days after Order Date, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a notice to every known creditor who has a claim against the Petitioners of more than $5000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder.

44.    The Petitioners and the Monitor are at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Petitioners' creditors or other interested parties at their respective addresses as last shown on the records of the Petitioners and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

45.    Any Person that wishes to be served with any application and other materials in these proceedings must deliver to the Monitor by way of ordinary mail, courier, personal delivery or electronic transmission a request to be added to a service list (the "**Service List**") to be maintained by the Monitor. The Monitor shall post and maintain an up to date form of the Service List on its website at: ~~http://documentcentre.eycan.com/verisgold~~

www. ey. com /ca/verisgold

46.    Any party to these proceedings may serve any court materials in these proceedings by emailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, and the Monitor shall post a copy of all prescribed materials on its website at: ~~http://documentcentre.eycan.com/verisgold~~ www.ey.com/ca/verisgold.

47.    Notwithstanding paragraphs 43 and 44 of this Order, service of the Petition, the Notice of Hearing of Petition, the Affidavit #1 of Shaun Heinrichs this Order and any other pleadings in this proceeding (collectively, the "**Materials**"), shall be made on the federal and British Columbia Crowns in accordance with the *Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50, and regulations thereto, in respect of the federal Crown, and the *Crown Proceeding Act*, R.S.B.C. 1996, c. 89, in respect of the British Columbia Crown.

**GENERAL**

48.    The Petitioners or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

49.    Nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Petitioners, the Business or the Property.

50.    This Court requests the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies, including any Court or administrative tribunal of any Federal or State Court or administrative body in the United States of America, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Petitioners and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Petitioners and the Monitor and their respective agents in carrying out the terms of this Order.

51.    Each of the Petitioners and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located,

for the recognition of this Order and for assistance in carrying out the terms of this Order and the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the Petitioners to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the *United States Bankruptcy Code*, 11 U.S.C. §§ 101-1532, as amended.

52.    For the purposes of any applications authorised by paragraph 51, the centre of main interest of the Petitioners is located in British Columbia, Canada.

53.    The Petitioners may (subject to the provisions of the CCAA and the BIA) at any time file a voluntary assignment in bankruptcy or a proposal pursuant to the commercial reorganization provisions of the BIA if and when the Petitioners determines that such a filing is appropriate.

54.    The Petitioners are hereby at liberty to apply for such further interim or interlocutory relief as it deems advisable within the time limited for Persons to file and serve Responses to the Petition.

55.    Leave is hereby granted to hear any application in these proceedings on two (2) clear days' notice after delivery to all parties on the Service List of such Notice of Application and all affidavits in support, subject to the Court in its discretion further abridging or extending the time for service.

56.    Any interested party (including the Petitioners and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to all parties on the Service List and to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

57.    Endorsement of this Order by counsel appearing on this application is hereby dispensed with.

- 21 -

58.    This Order and all of its provisions are effective as of 12:01 a.m. local Vancouver time on the Order Date.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____

Signature of Magnus Verbrugge
☐ Party   ☑ Lawyer for the Petitioners

BY THE COURT

_____

REGISTRAR

Certified a true copy according to
the records of the Supreme Court
at Vancouver, B.C.
This _9_ day of _JUNE_ 20_14_.

_____
Authorized Signing Officer

summary reason

## Schedule "A"

| Counsel Name | Party Represented |
| --- | --- |
| John Sandrelli | Ernst & Young Inc. |
| DAVID BROWN | Deutsche BANK A.G. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

1

**EXHIBIT 2**

2

**CASH FLOW FORECAST**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 25934136v1 00/00/0000

VERIS GOLD CORP. et.al
Consolidated CCAA Cash Flow Forecast
for the period June 9, 2014 to September 5, 2014

Estimated Gold Price $1,250

| Week Ending | Projected Week 1 13-Jun | Projected Week 2 20-Jun | Projected Week 3 27-Jun | Projected Week 4 04-Jul | Projected Week 5 11-Jul | Projected Week 6 18-Jul | Projected Week 7 25-Jul | Projected Week 8 01-Aug | Projected Week 9 08-Aug | Projected Week 10 15-Aug | Projected Week 11 22-Aug | Projected Week 12 29-Aug | Projected Week 13 05-Sep | Actual Total 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jerritt Tons Processed | 26,600 | 26,600 | 26,600 | 23,100 | 23,100 | 23,100 | 23,100 | 23,100 | 23,100 | 23,100 | 23,100 | 23,100 | 23,100 | 310,800 |
| Newmont Tons Processed | | | | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 35,000 |
| Payable Ounces Produced | 3,909 | 3,909 | 3,909 | 3,394 | 3,394 | 3,394 | 3,394 | 3,394 | 3,394 | 3,394 | 3,394 | 3,394 | 3,394 | 45,669 |
| Net Ounces Sold | 5,069 | 3,897 | 3,897 | 3,384 | 3,384 | 3,384 | 3,384 | 3,384 | 3,384 | 3,384 | 3,384 | 3,384 | 3,384 | 46,704 |
| Opening Cash Balance | 843,457 | 2,019,738 | 3,025,846 | 3,420,062 | 2,047,209 | 2,189,117 | 1,755,924 | 2,096,232 | 606,329 | 1,437,837 | 1,077,363 | 1,611,991 | 934,838 | 843,457 |
| Operating Cash Inflows | 6,336,858 | 5,578,438 | 4,871,068 | 4,230,138 | 4,230,138 | 4,230,138 | 4,230,138 | 4,230,138 | 4,881,138 | 4,230,138 | 4,230,138 | 4,881,138 | 4,230,133 | 60,389,754 |
| Payroll Commitments | (360,000) | (985,000) | (450,000) | (1,015,000) | (450,000) | (1,015,000) | (360,000) | (925,000) | (360,000) | (925,000) | (360,000) | (925,000) | (860,000) | (8,990,000) |
| Operating Expenditures | (3,378,342) | (3,329,331) | (3,130,331) | (3,772,331) | (3,064,831) | (3,248,331) | (3,055,331) | (3,829,831) | (3,154,331) | (3,179,831) | (3,021,010) | (3,250,510) | (3,715,010) | (43,150,346) |
| Tax and Non-Discretionary Payments | (150,000) | (45,000) | (163,000) | (210,000) | | (45,000) | (18,000) | (160,000) | (45,000) | (45,000) | | (805,000) | | (1,641,000) |
| Insurance and Leasing Expenditures | (430,145) | (10,000) | (283,500) | (404,429) | (227,300) | (10,000) | (283,500) | (404,429) | (227,300) | (10,000) | (141,500) | (152,000) | (621,729) | (3,205,833) |
| Corporate Expenses | (86,100) | (48,000) | (128,000) | (45,076) | (11,100) | (123,000) | (18,000) | (154,781) | (18,000) | (184,781) | (18,000) | (154,781) | (154,781) | (1,144,400) |
| Professional Fee Retainers and Fees (CCAA/U.S. proceeding) | (475,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (2,275,000) |
| Professional and Advisory Fees | (175,000) | (75,000) | (75,000) | | (100,000) | (25,000) | | (50,000) | (75,000) | (50,000) | | (75,000) | | (625,000) |
| Yukon Expenditures | (106,000) | (5,000) | (97,021) | (6,155) | (65,000) | (46,000) | (5,000) | (45,000) | (65,000) | (46,000) | (5,000) | (46,000) | (106,000) | (644,176) |
| Ending Cash Balance | 2,019,738 | 3,025,846 | 3,420,062 | 2,047,209 | 2,189,117 | 1,755,924 | 2,096,232 | 606,329 | 1,437,837 | 1,077,363 | 1,611,991 | 934,838 | (442,544) | (442,544) |

SEE ACCOMPANYING NOTES AND ASSUMPTIONS WHICH FORM AN INTEGRAL PART OF THIS CCAA CASH FLOW FORECAST

8 | 6 | 2o | 4
Date

Shaun Heinrichs , Chief Financial Officer

**Veris Gold Corp., Queenstake Resources Ltd., Ketza River Holdings Ltd., and Veris Gold U.S.A., Inc. (collectively "Veris Gold")**

**Notes and Assumptions to CCAA Cash Flow**
**For the period June 9, 2014 to September 5, 2014 (the "Forecast Period")**

**Disclaimer:**

In preparing this cash flow projection (the "**Projection**"), the Petitioners have relied upon unaudited financial information and the Petitioners have not attempted to further verify the accuracy or completeness of such information.   The Projection includes estimates and assumptions discussed below with respect to the requirements and impact of a Companies' Creditors Arrangement Act ("**CCAA**") filing.   The Projection is based on the probable and hypothetical assumptions outlined below.  Since the Projection is based on assumptions about future events and conditions that are not ascertainable, the actual results achieved during the Projection period will vary from the Projection, even if the assumptions materialize, and such variation may be material.  There is no representation, warranty or other assurance that any of the assumptions, estimates, and/or forecasts used in the Projection will be realized.

**Overview:**

Receipts and disbursements are denominated in United States dollars.

Exchange rate assumptions are as follows:

- USD to CAD = 1:1.09 (based on the current foreign exchange rate)

Gold price assumption is as follows:

- USD $1,250 per troy ounce (based on CME Group data as at Friday, June 6, 2014)

The Projection was prepared for the purposes of a CCAA proceeding assuming that Veris Gold files for protection under the CCAA on June 9, 2014.

**Probable Assumptions:**

**Beginning Balance:**

This is the estimated opening cash balance as at June 9, 2014.

**Receipts from Operating Cash Inflows:**

Represents revenue, estimated as follows:

a) Net Ounces Sold (forecasted receipts of $58.4 million)

   Veris Gold forecasts the sale of 46,704 troy ounces and production of 45,669 troy ounces of gold over the Forecast Period.  Production estimates are based on

management's best estimate, taking into accounts its knowledge of recoveries at its operating mines and historical production activity.

Veris would also draw down existing stockpiles.

Troy ounces are sold in the spot market and are settled one day subsequent to shipment.

b) Toll Milling (forecasted receipts of $2 million)

Veris Gold forecasts receipts of $2 million respecting its Toll Milling agreement with Newmont USA Ltd ("**Newmont**"). The forecast is based on Newmont supplies already on hand.

**Payroll Commitments:**

Represents payroll costs for Veris Gold's U.S. based employees and is based on historical run rates taking into account recent and planned reductions in non-essential employees.

Payroll is processed bi-weekly.

**Operating expenditures:**

Represents disbursements relating to the operating mines. These disbursements include payments to Small Mine Development and other mill related vendors (for supplies parts and services).

The forecast is based on existing development and supply agreements with third parties as well as historical run rates taking into account production forecasts. It assumes no payments on account of pre-CCAA filing liabilities.

Veris Gold forecasts minimal capital expenditures over the Forecast Period.

**Tax and Non-Discretionary Payments:**

Represents customary and non-discretionary payments (primarily to the Nevada State Government) on account of property taxes, land use, land lease and other employee related benefit taxes.

The forecast is based on Veris Gold's schedule of payments.

**Insurance and Leasing Expenditures:**

Forecast calculated on Veris Gold's existing insurance policies (property, workers compensation) and existing equipment leases.

**Corporate Expenses:**

Represents the costs of the Corporate Head Office including payroll, Director fees, office rent, IT support and reimbursement of employee and executive expenses.  Forecast is based on historical run-rates.

**Professional Fee Retainers and Fees (CCAA/U.S. Proceeding):**

Represents costs and retainers related to the Petitioners Canadian and U.S. counsel, the Monitor and the Monitor's counsel Canadian and U.S. counsel.

**Professional Fee and Advisory Fees:**

Represents professional and advisory fees primarily in respect of its refinancing strategy (Raymond James and legal advisors).

**Yukon Expenditures:**

Represents the costs of Ketza's operations in the Yukon, including payroll and benefits, utilities and travel.  Forecast is based on historical run-rates.